**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

MARION L. DELAWDER,
    Plaintiff,

V.                             Civil Action No.  1:08cv94

MICHAEL J. AS TRUE,
Commissioner of
Social Security Administration

## OPINION/REPORT AND RECOMMENDATION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

HER  claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f.  The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I.
### PROCEDURAL HISTORY

Plaintiff, at the time of the ALJ hearing, was a 39 year old married female with two children.

She  filed her application of DIB and SSI on November 30, 2005, claiming disability because of back

problems, pain and depression.  R. 191-193.  Plaintiff's applications were denied initially (R. 39-41)

and on reconsideration.  R. 52.  Plaintiff requested a hearing (R. 60) which was held before ALJ

Warren Moon (hereinafter "ALJ") on July 19, 2007.  R. 21.  Plaintiff, represented by counsel,

appeared and testified before the ALJ.  Vocational Expert John M. Panza also appeared and testified

at the hearing.  The ALJ rendered an unfavorable decision dated October 9, 2007. R. 21-36.  Plaintiff

requested review of the ALJ's decision by the Appeals Council. I to the appeal, Plaintiff requested and received leave to file additional evidence not previously before the ALJ. R. 8-13, 14. On February 6, 2008 the Appeals Council denied Plaintiff's request for review thereby making the decision of the ALJ the final decision of the Commissioner. R. 5-7. Plaintiff timely filed the within civil action for judicial review.

## II.
## STATEMENT OF FACTS
### A. Medical Record

Plaintiff was a line worker at a Pilgrim's Pride Chicken Plant from June, 1997 until she was "fired" on August 5, 2005. R. 228, 236.

Plaintiff reported herself to be 5'3" tall weighing 145 lbs when she filled out her Disability Report- Adult. R. 235. In the report, Plaintiff complains that she suffers: "constantly in pain in back, shoulders get knots and my arms and hand are in constant pain. Can't walk or stand for long periods of time. Even when I am sitting I have to continue to change positions." R. 236. She reported she was reduced to light work. She also reported her "Doctor recommended that I not work and eventually I was let go." R. 236. In the same report, Plaintiff listed her medications as: Alderol xr, methodone, pain patches, and Wellbutrin. She denied she had any side effects from any of the listed medications. R. 241.

In a later Disability Report-Appeal Plaintiff again reported her medications to be: Alderol xr, methodone, pain patches, and Wellbutrin and she again denied having any side effects from any of those medications. R. 255.

On July 6-7, 2006 Plaintiff prepared a personal pain questionnaire and function report. R. 262-274. Within these documents Plaintiff described her back pain as constant, debilitating, life changing, and radiating. The pain was reported as constant when working but only a couple times

daily once she was no longer working. R. 265. She reported her medications (Methadone, Ultram, Tizanidine, and Trileptal) caused side effects of: "sleepiness, no energy, constapion [sp], bad mood." R. 263. She described the medicines as helping the pain but not stopping it completely. R. 263. From a function stand point, Plaintiff stated she did some intermittent house cleaning between taking medication and resting; helped her husband with money matters; has difficulty dressing, bathing, caring for her hair, shaving, and putting on her make up because of pain and its limitation of motion of her arms; feeds her cats; occasionally fixes sandwiches for the family meal leaving the main cooking for her two teenage and relatively self sufficient children; has someone else drive when she goes out a couple times a week to shop because her foot gives out; is forgetful and loses concentration particularly with the family check book entries; and was depressed over the pain and her personal situation. R. 267-274.

Plaintiff, by counsel, filled out a Disability Report - Appeal wherein she states she had "increasing pain into left leg; increasing upper back and arm pain; and more pain in hands." R. 276. She listed her medications and their side effects as: Advair-none, Albuterol-increased heart rate, alderol xr-none, Ativan 1 mg-drowsiness, Ibuprofen 600mg-gastrointestinal problems, methodone-none, Tizaridine-drowsiness, Trileptal-drowsiness, Ultram-sweating, and Wellbutrin-none. R. 277. Plaintiff stated she had: "Loss of interest in caring for myself. Pain limits my ability to do routine tasks of dailing living. Depression causes lack of interest in life, in general." R. 279.

Plaintiff was seen by Doctor of Chiropractic, Earl N. Williams between October 1999 and January 18, 2006. R. 309-315. Inititially, Plaintiff was treated for complaints of cervical and thoracic spine pain; some paresthesia in the upper right extremity; and low back pain, "but not of any severity." R. 309. After the initial 8 week term of treatment, she was described as continuing to have some problems with her cervical and thoracic spine, but feeling considerably better. In

December 2001, she returned complaining that the cervical and thoracic pain had extended into the shoulder and low back area from November 16, 2001. She was only seen twice for those complaints, but seemed to improve by the second visit. She was next seen in 2004 complaining of low back and gluteal pain radiating into the lower extremity to the knee. X-rays taken December 20, 2004 showed moderate degenerative disc changes at L5-S1. From 2004 to April 2005 Plaintiff was seen periodically as needed and appeared to progress fairly well. On April 27, 2005 she appeared complaining of cervical and thoracic pain extending bilaterally in the upper extremities, worse on the right side including paresthesia in the right hand. Examination reflected limitation in ROM in the cervical spine and a positive right side Tinels test. However, she was neurologically in tact in the upper extremities. By May 23, 2005 she reported she was feeling better and having less cervical, thoracic and lower back pain. Plaintiff was seen in July with similar complaints as in May. She was next seen on December 21, 2005 in acute low back pain extending into the right lower extremity to the lateral thigh and calf. This was her condition when last seen by DC Williams on January 18, 2006. From the accompanying office visit notes, the following is of some import: 1) Plaintiff saw DC Williams a total of 11 times between March 14, 2005 and January 18, 2006; 2) March 8, 2005 she had limitation in lumbar ROM in left lateral flexion, DTR of the lower extremities are +2 and equal with no weakness, loss of sensation and no swelling, SLR was negative and the recommended course of treatment was walking and home knee/chest stretches to help develop some mobility and flexibility in the back[1]; 3) by May 23, 2005 Plaintiff reported she was feeling much better and having less low back pain but continued to have some cervical pain and stiffness; and 4) from December 21, 2005 to the last date seen, January 18, 2006, Plaintiff complained and was treated three times for

---

[1]This is the only note of this course of treatment and there is no record of whether Plaintiff complied with the recommended exercises or how she responded to them if she did them.

acute right low back pain and right lower extremity pain, stated she had been fired from her job at Pilgrim's Pride and was applying for disability due to spinal conditions. R. 312-315.

Relative to claimed disabilities at issue, records note that: on November 13, 2000 Plaintiff presented to Dr. Babenco of Grant Memorial Pain Clinic reporting that she had received minimal help from the last TP injections; on January 29, 2001 Plaintiff was given repeat trigger point injections for her complaints of neck and scapular pain; and on September 21, 2001, Plaintiff reported she got some relief from trigger point injections and was given another injection on that date. R. 573-574.

Dr. Sarim R. Mir treated Plaintiff from October 2001 to August 2004 primarily for complaints of pain in the right shoulder and tingling and numbness in the right hand. Dr. Mir's treatment notes reflect: October 17, 2001 decreased sensation in digit two of the right hand and tenderness on palpation over the right deltoid and pain on circumduction of the right shoulder which was treated with Loritab and Celebrex R. 600 ; November 14, 2001 EMG report showing electro physiological evidence of mild compression of the right median nerve at the wrist R. 598-599; January 16, 2002 diagnosis of mild carpal tunnel syndrome and shoulder sprain treated with Celebrex and Lorcet R. 597, 596; February 20, 2002 report of returning to work with decreased discomfort in her shoulder and no complaint of any paresthesias in the left upper extremity and continuing treatment with Serzone, Lorcet and Celebrex R. 595; May 15, 2002 unchanged conditions R. 593; June 19, 2002 unchanged conditions R. 592; July 31, 2003 unchanged conditions and Plaintiff's insistence that she continue at her regular work in the chicken factory instead of light duty R.591-590; August 25, 2003 diagnosis of symptoms suggestive of carpal tunnel syndrome unconfirmed by any EMG/Nerve Conduction Studies R. 588-589; December 4, 2003 diagnosis of tendinitis and medial epicondylitis R. 586-587; February 12, 2004 injections of Kenalog 10 mg in

the common extensor tendon and continued treatment with Loritab and Celebrex R. 562 R. 582-585; May 10, 2004 continuation of Lorcet during work changing from Celebrex to Prevacid 500 mg to aleviate stomach discomfort R. 580-581; and an August 30, 2004 notation that Plaintiff lost some of her medication and, although she complained of discomfort in both wrists and in her neck while continuing to work at the chicken plant, she was in no acute distress and was transferring her treatment from Dr. Mir to Dr. Sherry. R. 575-576.

Dr. William Russell, Board Certified in Physical Medicine and Rehabilitation, performed a June 11, 2003 independent medical examination of Plaintiff diagnosing objective and subjective evidence of carpal tunnel syndrome, moderate to severe on the right side. R. 602-605.

Plaintiff began being seen by doctors, nurses, physicians assistants and other medical personnel of the E.A. Hawse Health Center: presenting on December 15, 2003 complaining she did not care much for her doctor at Potomac Valley Medicine and needed different medication for her depression. Plaintiff reported depressive symptoms, feeling down in the dumps, frequent crying spells, feelings of worthlessness and feeling as if she wants to run away. Amy Kump, P.A. diagnosed: depression and history of hyperlipidemia and gave her prescription samples of Lexapro 10 mg with instructions to have her lipids checked and to followup. R. 458.

January 2, 2004 Plaintiff was seen by a Hawse nurse complaining of cough and low back pain. The nurse gave Flexeril and Loritab for the back pain and suggested physical therapy which Plaintiff showed no interest in pursuing. Nurse recommended decreasing smoking from the then 11/2 pack per day habit reported by Plaintiff. R. 457.

Plaintiff presented on April 13, 2004 again complaining of a productive cough that started on the Thursday before. She reported she was still smoking 1.5 packs of cigarettes per day and was taking her husband's Wellbutrn instead of the Prozac prescribed for her. P.A. Kump diagnosed

bronchitis, cough and depression and prescribed Wellbutrin, samples of Nasonex with follow-up. R. 456.

On April 17, 2004 Plaintiff called in complaining of continued cough and that her medicine "is not strong enough. I get bronchitis 3-4 times a year. I have to change to another antibiotic. I should be better now." The nurse encouraged her to decrease her tobacco use, added Lexapro and Cymbalta to the prescription regimen and encouraged Plaintiff to come in which was refused. R. 455.

MS Bryan J. Wodaski of Tri State Hand and Occupational Therapy, Inc. reported Plaintiff had canceled her therapy sessions and was not willing to have her lateral epicondylitis treatments. He complained Plaintiff was not compliant with treatments and recommended discharge. R. 606-609.

Plaintiff presented on May 27, 2004 complaining of possible bronchitis of one day duration. Record reflects Plaintiff "does smoke cigarettes, about a pack and one-half per day." P.A. Kump diagnosed Bronchitis, Cough, Depression and prescribed Albuterol solution, Advair, Albuterol inhaler, Zithromax or Z-pack and Wellbutrin XL samples with follow-up. R. 454.

Plaintiff presented July 14, 2004 complaining of continued depression, not having any energy at all, seeming to have a hard time with concentrating and inability to complete tasks, finish things, and problems with remembering things in spite of taking Wellbutrin and Lexapro. P.A. Kump diagnosed depression and insomnia. She added Elavil to the Lexapro, recommended counseling and follow-up. R. 453.

On November 10, 2004 Plaintiff presented complaining of external issues including fighting with her sister with whom she works. She claimed this affected her depression. P.A. Kump diagnosed depression and increased her medication Rx, advised her that any further medicine

changes would have to be as a result of a consult with a psychiatrist and gave her a one day excuse from work. R. 452.

A cervical MRI was performed on Plaintiff at Rockingham Memorial Hospital on November 17, 2004 which was read as "negative MR cervical spine; no evidence of focal disc herniation or spinal stenosis. No evidence of intrinsic cervical cord abnormality." R. 552

On January 18, 2005 Plaintiff presented complaining of persistent depression following a "huge blowout" with her husband which resulted in him being taken away and jailed until bonded out by a family member. P.A. Kump diagnosed depression exacerbated secondary to situation, tabacco addition and cough. She advised Plaintiff to continue medications, to see Tina Billmeyer and to follow-up. R. 451.

February 2, 2005 Plaintiff presented for follow-up stating that the was doing a little better. She had missed both appointments scheduled with Tina Billmeyer. P.A. Kump diagnosed continued anxiety, depression and tobacco addiction. Plaintiff was warned she would not be given work excuses until her follow up to confirm that she had seen Billmeyer. Then she was taken to see Billmeyer and given a work excuse and scheduled for follow-up. R. 449.

Plaintiff was next seen on March 1, 2005 for follow-up at which time she reported seeing counselor Greg Trainor; had resumed cohabitation with her husband; and had continuing problems with stress management, depression and anxiety. P.A. Kump diagnosed depression, anxiety, tobacco addition, and history of heart disease. Blood work was ordered, Adair Rx refilled and warned no work excuse until proof received that Plaintiff was seeing counselor Trainor. Follow-up was scheduled for a month later. R. 447.

March 22, 2005 blood work reflected 256 total cholesterol and 142 triglycerides. R. 443.

On March 30, 2005 Plaintiff presented for follow-up with Dr. Trainor and reported no back

pain lately. P.A. Kump diagnosed hyperlipidemia and depression, currently controlled on Cymbalta. P.A. Kump prescribed samples of Zocor, refilled Cymbalta, gave Plaintiff a work excuse to April 18, 2005, and warned Plaintiff that she would have to think about returning to work by the next follow-up. R. 439.

Plaintiff presented for follow-up on depression and anxiety on April 18, 2005. She reported she was still counseling with Greg Trainor and that her back was feeling somewhat better depending on her activity. P.A. Kump diagnosed depression/anxiety and allergic rhinitis. She began to taper Plaintiff off Cymbalta, start her on Effexor, gave her Clarinex samples, gave her a work excuse to April 25, 2005 but warned her that no further work excuses would be given and if she needed more they would have to be issued by the doctor taking care of her back. R. 438.

Between October 2004 and August 2007, Plaintiff was seen and treated by Dr. Sherry for chronic complaints of bilateral shoulder, arm and back pain. R. 481- 559. During the period she was seen approximately thirty-five (35) separate times and received medications in addition to the following injection modalities: November 16, 2004 myoneural block trigger point injection right elevator and rhomboid muscles R. 554; December 28, 2004 therapeutic injection of Norflex 60 mg and Toradal 30 mg injections R. 549; January 12, 2005 superior gluteal nerve block injections (left) R. 546; January 24, 2005 introlaminar cervical epidural steroid injection under fluoroscopic guidance R. 545; March 23, 2005 myoneural block trigger point injection bilateral upper tapezius muscles R. 537; April 4, 2005 left L5-S1 lumbar transforaminal epidural steroid injection under fluroscopic guidance R. 535; May 11, 2005 myoneural block trigger point injection bilateral trapezius muscles R. 529; June 14, 2005 lumbar median branch blocks left L4/5-L5/S1 levels done under fluoroscopic guidance R. 526; August 9, 2005 myoneural block trigger point injections in the upper trapezius muscles R. 518-519; October 3, 2005 bilateral dorsal scapular nerve block injections utilizing the

Elevator Scapulae Tendon Sheath Approach R. 516-517; November 28, 2005 superior clinical nerve block injections in both hands R. 512-513; December 22, 2005 therapeutic injection of Norflex 60 mg and Toradal 30 mg for radiating low back and right hip pain R. 510-511; December 30, 2005 myoneural block trigger point injections of the trapezius, rhomboids and quadratus lumborum muscles R. 508-509; May 12, 2006  myoneural block trigger point injections of the trapezius, rhomboids and quadratus lumborum muscles R. 499-500; June 9, 2006  myoneural block trigger point injections of the bilateral quadratus lumborum and piriformis muscles R. 497-498; October 26, 2006 myoneural block trigger point injections of right rhomboid, right erector, bilateral gluteus maximus and piriformis muscles R. 495-496; November 21, 2006 myoneural block trigger point injection of bilateral trapezius and rhomboid muscles R. 493-494; December 19, 2006 myoneural block trigger point injection of bilateral trapezius and rhomboid muscles R. 491-492; January 16, 2007 myoneural block trigger point injection of bilateral trapezius, rhomboid, and l/S paraspinal muscles  R. 489-490; February 15, 2007 myoneural block trigger point injection of bilateral trapezius, rhomboid, and l/S paraspinal muscles R. 487-488; March 15, 2007 myoneural block trigger point injection of bilateral trapezius, rhomboid, and l/S paraspinal muscles R. 485-486; March 28, 2007 myoneural block trigger point injection of bilateral trapezius, rhomboid, and l/S paraspinal muscles R. 483-484; and April 12, 2007 myoneural block trigger point injection of bilateral trapezius, rhomboid, and l/S paraspinal muscles R. 481-482.  By report dated August 19, 2007, Dr. Sherry noted Plaintiff had failed random screening for controlled substance compliance in that the prescribed medications were not showing up in her blood stream whereas amphetamines (not prescribed by Dr. Sherry) were present.  As a result of the two failed screens, no further controlled substances were to be prescribed by the clinic.  R. 609.

A lumbar MRI was performed on Plaintiff on March 1, 2005 the results being read: "Mild

disc desiccation at L5-S1. Very small central, focal disc protrusion at L5-S1 producing minimal anterior impression upon the theca sac. Otherwise, unremarkable MRI of the lumbar spine." R. 540.

Plaintiff was evaluated by Dr. ChuanFang Jin, Assistant Professor of WVU Department of Occupational Medicine on May 3, 2005 for complaints and claims of upper shoulder and neck pain and bilateral carpal tunnel syndrome. Dr. Jin concluded: "The patient has very mild/minimal abnormality on EMG study. Her symptoms are not classical carpal tunnel syndrome presentation, which indicate co-existing underlying disorder(s) beside carpal tunnel syndrome. Based on Table 16 on page 57, the left carpal tunnel is within mild category, which is estimated 2% upper extremity impairment based on the clinical findings. The right carpal tunnel is 0% upper extremity impairment (normal EMG, non-typical clinical presentation). 2% upper extremity impairment was converted to 1% whole person impairment by using Table 3 on page 20." R. 477-479.

Plaintiff presented on May 18, 2005 complaining of a possible sinus infection and dark spots on her eyelids. P.A.-C. Kump provided prescription medicine samples and prescriptions with follow-up. No mention of the back appears in this record. R. 437.

On June 27, 2005 Plaintiff appeared stating that she had stopped taking Zocor 2-3 weeks before because she felt it was making her pain worse. She further reported cessation of Zocor did not improve her pain symptoms. P.A.-C. Kump resumed the Zocor and scheduled follow-up for a lipid profile and CMP. R. 436.

Dr. James L. Rising's progress note of July 7, 2005 reflects diagnoses of: chronic low back pain, history of depression, history of asthma, history of hyperlipidemia, history of anxiety disorder, and history of tobacco addiction. Dr. Rising planned to arrange for a consult with Dr. Chadduck. He advised the Plaintiff to continue with her routinely prescribed medications. He also gave her a release from work to July 11, 2005 and ordered follow-up prn. R. 434-435.

A functional capacity assessment was made of Plaintiff on July 14, 2005. From testing, the evaluator opined Plaintiff exhibited symptom magnification. R. 521. The evaluator also opined Plaintiff could only occasionally lift irrespective of the weight and did not meet the medium capabilities for work because of her lifting limitation. R. 520-523.

On August 9, 2005 Plaintiff presented requested a work excuse complaining of major depressive disorder and chronic back pain. Dr. Rising diagnosed major depressive disorder and referred her again to clinical psychologist Tina Bill meyer. He also gave her an excuse from work for one week or until August 15, 2005. R. 432.

Elizabeth Smith, M.D. saw and treated Plaintiff for a yeast infection on August 23, 2005. R. 430.

Plaintiff was seen and received services from Betsy O'Neal, LPC of Family Preservation Services of West Virginia, Inc. in the late fall of 2005. R. 290-307. She presented for counseling and individualized in home treatment for divorce and domestic problems related to domestic violence. Her initial GAF was 45. Counselor notes reflect a history of domestic violence perpetrated on Plaintiff by her husband since his ATV accident and related head trauma in November 2001. Plaintiff also reported being the victim of sexual abuse as a child. She also reported back problems from a work related injury. The counselor rated Plaintiff severe with respect to poor concentration, withdrawal, depression, anxiety, blunted affect, hope/helplessness, apathy, distractibility, insomnia/hyper insomnia and loss of interest. R. 297. Plaintiff was rated "marked dysfunction" with respect to concentration task performance and "moderate dysfunction with respect to self care; activities of community living; social, interpersonal, family; and maladaptive, dangerous, and impulsive behaviors. R. 305.

October 4, 2005 Greg Trainor provided an Outpatient Counseling Evaluation/Assessment

diagnosing Plaintiff as having major depression, severe; back pain; marital problems, loss of job.

Between November 1, 2005 and November 20, 2007 Plaintiff's medications were evaluated ten times and her mental functional capacity was once evevaluated by Cristina Goldizen, MD. Only once during the period did the evaluator note any adverse effects of the medications on Plaintiff. R. 614-623. Christina Goldizen, MD. Medication Management Notes for 11/1/05, 12/6/05, 1/12/06, 2/7/06, 4/20/06, 6/20/06 and 8/23/06 do not reflect any reported adverse effects of the medications Plaintiff was taking. The report for 2/7/07 does note decreased sleep and energy, a report not repeated before or after that date. R. 375-381. Dr. Goldizen's completed Mental Residual Functional Capacity Assessment of Plaintiff on November 20, 2007 and filed as a post hearing/decision exhibit (R. 627-644) found:

1. <u>Markedly Limited:</u>

    a.     The ability to understand and remember detailed instructions.

    b.     The ability to carry out detailed instructions.

    c.     The ability to maintain attention and concentration for extended periods.

    d.     The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

    e.     The ability to sustain an ordinary routine without special supervision.

    f.     The ability to work in coordination with or proximity to others without being distracted by them.

    g.     The ability to make simple work-related decisions.

    h.     The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

  i.  The ability to accept instructions and respond appropriately to criticism from supervisors.

  j.  The ability to get along with coworkers or peers without distracting them or exhibiting behavioural extremes.

  k.  The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

  l.  The ability to repond appropriately to changes in the work setting.

  m.  The ability to travel in unfamiliar places or use public transportation.

  n.  The ability to set realistic goals or make plans independently of others.

2.  <u>Moderately Limited</u> in all other areas of evaluation under the categories of: Understanding and Memory; Sustained Concentration and Persistence; Social Interaction; and Adaptation.

On the same date, Dr. Goldizen performed a Psychiatric Review Technique on Plaintiff concluding that from October 2005 to November 20, 2007 Plaintiff:

1.  Equaled the 12.04 affective disorder listing characterized by disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidence by:

  a.  anhedonia or pervasive loss of interest in almost all activities;

  b.  appetite disturbance with change in weight;

  c.  sleep disturbance;

  d.  decreased energy;

  e.  feelings of guilt or worthlessness;

  f.  difficulty concentrating or thinking; and

  g.  thoughts of suicide.

2.  Under the "B" Criteria of the listings was markedly functionally limited in:

a.   restriction of activities of daily living;

b.   difficulties in maintaining social functioning;

c.   difficulties in maintaining concentration, persistence or pace; and

d.   repeated episodes of decompensation, each of extended duration.  R. 627-644.

Plaintiff was diagnosed during an Outpatient Counseling Evaluation/ Assessment with major depression, severe related to back pain, marital problems from her marriage to an abusive husband who was in jail for domestic violence and her loss of a job.  R. 382-384.

On December 19, 2005 Plaintiff presented for referral to a pain management doctor or clinic closer to her home in Petersburg, West Virginia for management of her complaints of lumbar and neck pain.  P.A.-C. Kump scheduled a cervical, thoracic and lumbar spine MRI and referred pain management to Petersburg.  R. 424.

Susan L. Garner, M.D. examined Plaintiff on January 25, 2006.  Dr. Garner found: 1) no tenderness over the cervical spinous process and no evidence of paravertebral muscular spasm; 2) non-tender shoulders, elbows and wrists; 3) no atrophy of the wrists and hands, ability to make bilateral fists and ability to button and pick up coins with either hand and write with the dominant hand; 3) no tenderness,warmth, swelling, effusion of laxity of the knees and no tenderness, warmth redness or swelling of the ankles and feet; 4) tenderness in the right parvertebral muscle at the lumbar segment but no obvious muscle spasm, ability to flex forward and to the sides without difficulty, ability to stand on one leg at a time notwithstanding that her right hip was about 1 ½ inches higher than her left, and her straight leg raising was 20 degrees on the right and 60 degrees on the left without pain; 5) perserved strength in the upper and lower extremities without muscle atrophy; 6) deep tendon reflexs in the upper and lower extremities were normal; 7) Babinski and Hoffmann signs negative and no clonus. Dr. Garner concluded that Plaintiff had chronic lumbar pain

with scoliotic configuration preference (antalgic gait) of weight bearing to the left.  R. 316-323.

Plaintiff presented on January 26, 2006 complaining of nose sores, nasal congestion, and that she had run out of the Ultram prescribed for her by Dr. Sherry on January 14, 2006 and needed it refilled before her next scheduled appointment with him (Dr. Sherry) on February 14, 2007.  P.A.-C. Kump diagnosed lower back pain, Impetigo, infective rhinitis and herpes labialis history.  She prescribed Reflex, Zovirax, and Ultram.  R. 421.

Thomas C. Stein, Ed.D., performed a mental status examination on Plaintiff February 2, 2006.  R. 324.  He diagnosed "Axis I - Pain condition associated with general medical condition and psychological factors.  Major depression, recurrent type, non-psychotic.  Axis II-Personality disorder, NOS.  Axis III-Chronic back pain with bilateral sciatica.  Chronic neck and bilateral shoulder pain. Hypercholesterolemia. (By claimant report).  Prognosis: Fair."  He opined Plaintiff was: "Moderately deficient in the social functioning area because of the severity of her affective disturbance;""Moderately deficient" in concentration; "Mildly deficient" in persistence; and "Moderately slow" in pace.  R. 327.

The February 4, 2006 MRI reflected the alignment of Plaintiff's vertebral bodies were within normal limits, were normal in appearance to the conus; that the levels at L1-L2, L2-L3, L3-L4 were within normal limits; that the L4-L5 showed a mild right paracentral disc bulge not causing significant stenosis or foramina narrowing; and degenerative disc disease with a mild disc bulge causing some bilateral foramina narrowing without evidence of central canal stenosis at L5-S1.  R. 419-420.

An MRI of Plaintiff's lumbar spinal canal performed February 4, 2006 reflected "Alignment of the vertebral bodies is within normal limits with normal appearance to the conus.  L1-L2, L2-L3, L3-L4 levels are within normal limits.  L4-L5, there is a mild right paracentral disc bulge.  This does

not cause significant stenosis or foramina narrowing.  At L-5-SI, there is degenerative disce disease with mild disc bulge.  This is more prominent in the foramina region and does cause some bilateral foramina narrowing.  There is no evidence of central canal stenosis."  R. 329.

On March 15, 2006 Plaintiff presented to P.A.-C. Kump complaining that her antidepressants were not helping; that she was scheduled to see a psychiatrist but wanted to see someone sooner because she could not wait; she was having sinus and coughing problems; she had stopped taking her prescribed Adair because she did not think she had to continue taking it once she felt better; she did not want to be on pain medication anymore because she believed it was simply masking or covering up her problems instead of dealing with them; and she was having constipation since being on the pain medication.  R. 417.

Stacy Kehrer prepared a Physical Residual Functional Capacity Assessment on Plaintiff on April 12, 2006.  Kehrer found Plaintiff:  capable of occasionally lifting 20 poinds; frequently lifinting 10 pounds; capable of standing and or walking with normal breaks about 6 hours of an 8 hour workday; capable of sitting with normal breaks for about 6 hours in an 8 hour workday; capable of unlimited pushing and pulling; only occasionally limited in climbing, balancing, stooping, kneeling, crouching and crawling; should never to climb ladders, ropes or scaffolds; was without limitations with respect to manipulations, vision, communication, environment. Kehrer considered Plaintiff credible and reduced her RFC to light based on her history of back pain with scoliotic lean due to one hip being shorter that the other.  R. 331-337.

Joseph A. Shaver, Ph.D., performed a Psychiatric Review Technique on Plaintiff dated April 13, 2006.  He assessed Plaintiff:  under 12.04 Affective Disorders to have mood disturbance accompanied by depressive syndrome characterized by 1) anhedonia or pervasive loss of interest in almost all activities, 2) sleep disturbance, 3) decreased energy, and 4) difficulty concentrating or

thinking; under 12.07 to have a medically determinable impairment not satifying the the diagnostic criteria of Somatoform Disorders but described as : "pain condition assoc w gen med condition & psych factors Pertinent symptoms, signs, and laboratory findings that substantiate the presence of this impairment"; under 12.08 to have a medically determinable impairment not precisely satisfying the diagnostic criteria of personality disorders but described as: "personality D/O, NOS Pertinent symptoms, signs, and laboratory findings that substantiate the presence of this impairment".   Under the B Criteria, he rated Plaintiff's functional limitations as: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace with one or two episodes of decompensation of extended duration.   He found no evidence to establish the presence of C criteria.  R. 339-352.

Ph. D. Shaver also performed a Mental Residual Functional Capacity Assessment in which he concluded: 1) Plaintiff was moderately limited in her ability to understand and remember detailed instructions but not otherwise significantly limited with respect to memory and understanding; 2) was moderately limited in her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, her ability to work in coordination with or proximity to others without being distracted by them, and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods but was not otherwise significantly limited with respect to sustained concentration and persistence; 3) was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors but was not otherwise significantly limited with respect to social interaction; and 4) was not significantly limited with respect to adaptation.  Dr. Shaver concluded:

"It is believed that Clmt retains the mental capacity to operate in routine, low stress, work situations." R. 353-355.

After missing her appointment with her pain management doctor, Plaintiff presented to P.A.-C. Kump on May 24, 2006 seeking prescription refills for Wellbutrin, Zocor, Methadone and Ultram. Other than the request for prescription drugs, no other complaints were recorded and she appeared in no apparent distress. R. 413.

Plaintiff appeared before P.A.-C. Kump on June 19, 2006 complaining that her chronic obstructive airway disease was acting up and that she had sinus drainage. On this occasion, she was diagnosed with COPD, broncho spasm, cough, and bronchitis and was given medications and advised to use her albuterol inhaler consistently. R. 411.

On June 26, 2006, Hojoon Jung, M.D. reported that five views of Plaintiff's lumbar spine showed anatomical alignment, moderate narrowing of the L5-S1 disc space; the other disc spaces preserved and no significant facet disease. R. 410. Dr. Jung also repored that the PA and Lateral Chest films of Plaintiff's chest showed normal cardiac size; lungs which appeared clear without infiltrates, edema or pleural effusions; and no radiographic evidence of pneumonia or failure. R. 409.

On June 26, 2006 Plaintiff presented to P.A.-C. Kump with complaints of continuing cough. She was continuing to smoke. Kump diagnosed: lumbar back pain, tobacco use, continued cough and acute bronchitis. R. 408.

Blood tests results dated June 30 2006 reflected total chloresterol level of 227 and triglyceride level of 536. R. 403-407.

On July 18, 2006 Joseph Kuzniar, Ed.D. performed a Mental Residual Functional Capacity Assessment in which he concluded: 1) Plaintiff was either not significantly limited or there was no

evidence of limitation with respect to understanding and memory; 2) was moderately limited with respect to her ability to maintain attention and concentration for extended periods, her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, her ability to work in coordination with or proximity to others without being distracted by them, and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods  but was not otherwise significantly limited or there was no evidence of limitation in the remaining categories of sustained concentration and persistence; 3) was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes but was not otherwise significantly limited or there was no evidence of limitation in the other categories of social interaction; and 4) was not significantly limited or there was no evidence of limitation with respect to adaptation.  Dr. Kuzniar concluded: "The RFC ratings shows the capacity to carry out low level routine instructions within a very low to low social interation demand work setting.  The capacity for adaptation is as rated in section I-D."  R. 357-359.

Dr. Kuzniar also performed a Psychiatric Review Technique relative to Plaintiff on July 18, 2006 finding:   under 12.04 Affective Disorders mood disturbance accompanied by depressive syndrome characterized by 1) anhedonia or pervasive loss of interest in almost all activities, 2) sleep disturbance, 3) decreased energy, and 4) difficulty concentrating or thinking;   under 12.07 to have a medically determinable impairment not satifying the the diagnostic criteria of Somatoform Disorders but described as: "pain disorder associated with gen. med. cond. and psych factors"; under 12.08 to have a medically determinable impairment not precisely satisfying the diagnostic criteria of personality disorders but described as: "personality disorder".  Under the B Criteria, he rated

Plaintiff's functional limitations as: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration persistence and pace but he found no episodes of decompensation of extended duration. He found no evidence to establish the presence of C criteria. He concluded that the "function report statements are generally consistent with the CE report indicating full credibility. The function report does not show marked functional limitations due to mental impairment." R. 361-373.

On August 5, 2006 Plaintiff presented complaining of bilateral earache, sinus congestion and not feeling well. She was diagnosed with acute sinusitis and hyperlipidemia. R. 402.

On August 19, 2006 Plaintiff was seen by Dr. Lewis with cough and sputum for three weeks and was noted to be a positive smoker. R. 399.

On August 21, 2006 Plaintiff presented to William Lewis, M.D. and was diagnosed with chronic low back pain, radicular leg pain, gastroesophageal reflux disease and constipation for which she was prescribed Nexium and referred to a spinal surgeon. R. 401.

From September 2006 through November 2006 Plaintiff was treated and evaluated by Dr. Sanford Emery, Professor and Chair of WVU Department of Orthopaedics for her continuing complaints of low back pain radiating down her leg. Conservative treatments failed. November 14, 2006 x-rays were taken incident to decompression L5-S1 with bilateral foraminotomy back surgery. R. 466. Those x-rays showed "[diminished height of the L5-S1 intervertebral space...." R. 464A.

Thomas Lauderman, DO, a medical consultant, completed a physical residual functional capacity assessment of Plaintiff on September 6, 2006 finding Plaintiff: capable of occasionally lifting 20 pounds; frequently lifinting 10 pounds; capable of standing and or walking with normal breaks about 6 hours of an 8 hour workday; capable of sitting with normal breaks for about 6 hours in an 8 hour workday; capable of unlimited pushing and pulling; only occasionally limited in

climbing, balancing, stooping, kneeling, crouching and crawling; should never to climb ladders, ropes or scaffolds; was without limitations with respect to manipulations, vision, communication, environment. He concluded "Clmt. Is partially credible since the medical evidence does not substantiate the clmt's allegations to the degree alleged." R. 385-392.

On October 12, 2006 Dr. Jung compared the x-rays of plaintiff's chest and lungs with those of June 26, 2006 and again found the cardiac size to be normal; lungs to be clear and free of infiltrates, edema or pleural effusions. R. 397.

On October 12, 2006 Plaintiff with complaints of persistent bronchitis and cough. Dr. Rising noted a 39- pack- year history of smoking with chronic obstructive airway disease. R. 395.

On October 26, 2006 Plaintiff appeared before Dr. Lewis with sinusitis and bronchitis congested in her head. R. 396.

An October 26, 2006 three views of Plaintiff's sinuses were read by Dr. Misailidis to show bilateral maxillary sinusitis with near complete pacification of the right side. R. 394.

Dr. Andrew Mace read x-rays of Plaintiff's lumbar spine on April 2, 2007 comparing them to views taken November 14, 2006. His impression was: "postoperative changes from laminectomy at L5 with persistent degenerative changes at L5-S1." R. 464.

## B. Hearing Transcript

The exhibits as marked were admitted without objection. R. 649. Counsel makes it clear from the outset of the hearing that Plaintiff is relying on the combined effects of low back pain from surgery, upper back and neck pain, bilateral carpal tunnel syndrome and depression. R. 657.

At the time of the hearing in November 2007 Plaintiff was 39 years of age. R. 664. She stood 5 feet tall and weighed about 165 pounds. R. 664. Plaintiff testified she was not able to maintain her weight and had gained a lot of weight over the past year. R. 665. She has three cats

and three dogs that are maintained and fed by her husband and oldest daughter living at home. R. 668. Plaintiff usually drives about 5 miles once a week to a store for incidental groceries that are needed in addition to those purchased by her husband. R. 668.

Plaintiff ceased working in July 2005 and has had no income of her own since her disability payments ran out approximately three months later. R. 669. Plaintiff's husband worked maintenance until he suffered a 2001 brain injury in a four-wheeler (ATV) accident. He now receives Social Security Disability Income. R. 670.

Plaintiff quit school in the ninth grade but later earned her GED. R. 672.

Plaintiff last worked at Pilgrim's Pride performing light duty straightening out of rubber bands in the first aid office. This work lasted for approximately six months and did not involve lifting or carrying anything over ten pounds. Plaintiff testified she had pain in her back "and stuff" that caused her problems doing her work. R. 673-675. About two years prior to being put on light duty, she worked as a line worker hanging chickens that had been cleaned on a line taking them to be cut up. R. 676, 679. She had to hang a chicken about every second and she was also required to lift and carry tubs of chickens weighing approximately 70 pounds. R. 676-677. She would rotate every hour or so to another task or job on the line, some of which were easier than others. R 678. Plaintiff transferred from the line job to the wing wheel where she hung approximately 120 chicken wings per minute on a wheel in preparation for them to be cut into pieces to use in making wing dings. R. 679. She also worked deboning chicken breasts at her own pace. R. 680. Plaintiff never supervised any workers. R. 681.

Between 1988 and 1990 Plaintiff worked full time in a sewing factory. R. 681-682. She left the sewing factory because of complications with her pregnancy and because she wanted to stay home and raise her young children. R. 682. For extra income, she did baby sitting and day care

during the summer for kids in the area where she lived earning about $100 to $150 per week.  R. 682-683.

Plaintiff testified she cannot work because of constant pain in both shoulders and her back and lower back which radiates to her big toe no matter what she is or is not doing.  R. 684-686.  She states the pain started in 1999.

In November 2006 Dr. Emory performed surgery on Plaintiff's back.  Plaintiff testified she went to physical therapy once , but it was too painful and she did not go back and did not return to see Dr. Emory.  R. 691.  Instead, Plaintiff testified she used a tens unit provided to her by her chiropractor some time before the surgery.  She testified she would use it a lot and would leave it on as musch as a half of every day.  R. 692.  She also used a heating pad but stated it did not help much.  R. 693.

Plaintiff testified the surgery relieved her back pain some but did not eliminate it.  She also testified she was able to sleep some since the surgery.  She takes six pain medications daily including:  Trazadine, Zanaflex, Methadone, Tramadol, Neproxen prescribed for her by Dr. Sherry. R. 693-695.

According to the recorded colloquy between the ALJ and counsel for Plaintiff, the last IME performed on Plaintiff was Dr. William Russell's of March 4, 2002.  It was performed relative to a workers compensation claim.  It did not rate the back injury and found that the back injury was not permanent.  Plaintiff also had an IME for her carpal tunnel workers compensation claim in 2000 which resulted in a 1% whole person disability rating.  R. 695-698.

Plaintiff testified she also has arms and hands pain and depression.  For her depression, Plaintiff takes: Celexa, Wellbutrin and Ativan prescribed by the psychiatrist she sees once every three months.  R. 698-699.

Plaintiff testified she does not cook, do laundry, grocery shopping, dishes or "things of that nature." R. 700. The husband has been doing those chores for three years prior to the hearing. R. 701. He also does the yard work. R. 710.

Plaintiff stopped seeing her chiropractor three years prior to the hearing because cracking her lower back caused more pain.

She testified her day involves getting up around 7:00 am and making sure her children have their books for school; eating a snack around noon; and laying down to watch television all day. R. 700-704. She does use a computer connected to the internet for bill paying. R. 705. Plaintiff ceased attending her church because she cannot sit in the church pew for the one and one half hour service. R. 710-711.

Plaintiff testified she has been restricted to lifting no more than five pounds, sitting for very long, standing for very long since the summer of 2005 when she was on light duty at Pilgrim's Pride. R. 712-713. She also testified she had weak grip, numbness and tingling in her hands that causes her to drop things and not be able to sleep at night. R713. She states she "can't sleep a lot. I hurt all night." R. 717. She affirms she is anxious and worries "a lot" which also affects her sleep and her concentration. She also says she has been diagnosed with ADHD. R. 718-720. Although she testified her carpal tunnel syndrome is worse on the right hand, her dominant hand, she has not had surgical release. She states her doctor's advised her to avoid repetitive motions. R. 714. Plaintiff also testified her medications affects her concentration and focus and causes her to lay in bed for extended periods. R. 715.

Even though Plaintiff stated she liked to crochet, walk, go on trips and swim, she stated she stopped doing those activities three years to five years prior to the hearing because: "For one thing I just can't bring myself to get up and do anything... And then if I do then I hurt too bad so I have to

lay back down. And I just feel like a lot of times it's not even worth trying." R. 707-708

Plaintiff testified that for the last four years she has been unable to ride in a car for the two and a half hours it takes to go with her children to a lake for outdoor activities. R. 708.

Plaintiff testified she smokes a pack of cigarettes per day even though she admits she has asthma and lung problems and was advised by her doctors at the time of her back surgery to stop smoking. R. 709.

With respect to the letter report of Linda H. Porter of West Virginia Division of Rehabilitation Services obtained just prior to the hearing, Plaintiff admits the letter is based only on what Plaintiff told Porter; that no tests were performed by Porter; and that Plaintiff did not believe Porter reviewed any of Plaintiff's medical records. R. 720-722.

John Panza, a vocational expert testified. The transcript of his testimony does not report the ALJ's initial hypothetical question and the initial limitations he included. R. 726-727. Based on the unreported hypothetical Panza opined there were jobs at the light level of: cafeteria worker, 420,000 national and 1400 West Virginia; light housekeeping 1.5 million national and 12,000 West Virginia, all of which fall into the DOT unskilled category. The ALJ posed a second hypothetical which added to the original hypothetical's limitations, the limitation of the individual to sedentary work. Based on this hypothetical, Panza testified there would be 300,000 jobs nationally and 1,000 West Virginia jobs as a sedentary, unskilled surveillance system monitor operator. He stated other unskilled sedentary jobs would be eliminated by the ALJ's limitation of the amount of contact the individual would have with the general public and because they involved or were associated with production rate quotas. R. 727. The ALJ next asked a third hypothetical question adding the following limitations to the second hypothetical: "[Although the individual could stand or walk for six hours in an eight hour workday. Wouldn't be able to stand or walk for more than 30 minutes at a time and

then would have to sit down for a few minutes. Could sit for six hours in an eight hour workday but would, again, have to be able to change position about every half hour of sitting. Would have to be able to get up and move around for a few minutes. And limiting the claimant to, with respect to the use of hands for repetitive reaching and grasping to no more than frequent." The ALJ defined "frequent" as the claimant would not be able to do reaching and grasping for two-thirds of a day. Panza opined the jobs he outlined under the second hypothetical would not be available to such a person. However, Panza testified that a person who worked in a parking lot where they would not be using their hands constantly but throughout the day would be required to reach and grasp, could would as a gate guard which had at least 100,000 jobs nationwide and 700 jobs in West Virginia or could work as a light level parking attendant for which there were 120,000 jobs nationally and 1200 jobs in West Virginia. Panza testified if the hypothetic person whould have to be off task two hours out of eight every work day or even two or three days a month, there would be no jobs. R. 727-731.

### III.
### CONTENTIONS OF THE PARTIES

Plaintiff's Contentions:

1.    The ALJ erred when he failed to properly consider the net effect of the plaintiff's combination of impairments.

    a.    The ALJ failed to consider the combined effect of Plaintiff's severe and non- severe impairments.

    b.    The ALJ failed to consider the effects of Plaintiffs medications.

    c.    The ALJ failed to consider the combined effect of Plaintiff's impairments and the effect of her medications.

    d.    The ALJ failed to explain his evaluation of the combined effects of Plaintiff's

impairments and medications.

2.　　The Appeals Council erred in failing to consider additional new and material evidence and/or failing to explain what, if any weight and consideration it gave to the allegedly new and material evidence.

3.　　The ALJ erred when he failed to properly determine the claimant's RFC.

    a.　　The ALJ erred in finding the Plaintiff was capable of performing light work with limitations without explaining for each function of such light work as required under Social Security Ruling 96-8p.

    b.　　The ALJ erred in failing to consider or explain why he did not consider the RFC of Dr. Sherry.

<u>Defendant's Contentions</u>:

1.　　Substantial evidence supports a conclusion that the ALJ properly considered Plaintiff's impairments separately and in combination.

2.　　The Appeals Council: is required only to review new and material evidence if it might reasonably require a different result than that reached by the ALJ; did review the additional evidence submitted by Plaintiff; and the law does not require a remand of the case because the Appeals Council did not provide a detailed explanation of its review of that evidence in its denial letter.

3.　　Substantial evidence supports the ALJ RFC; the ALJ was not required to consider Dr. Sherry's RFC because: a) if was dated July 14, 2005 prior to the relevant time period at issue; b) plaintiff engaged in symptom magnification during the testing justifying the ALJ to not consider the RFC; and c) had the ALJ considered the RFC, it would have supported his conclusion that Plaintiff was capable of performing the duties of light work.

4.	Even if there was error, the Court should not remand to perfect the opinion unless there is reason to believe that the remand might lead to a different result.

IV.
Discussion

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

A.	ALJ's failure to consider the combined effects of Plaintiff's severe and non- severe impairments.

The ALJ found Plaintiff had the following severe impairments: lumbar pain syndrome; residuals, status post L5-S1 decompression and foraminotomy secondary to spinal stenosis and disc herniation; chronic obstructive pulmonary disease; major depressive disorder, recurrent; and personality disorder. R. 23.

42 U.S.C. § 423(d)(2)(B) and 42 U.S.C. § 1382(c)(a)(3)(F) provide:

> In determining whether an individual's physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, <u>the combined impact of the impairments shall be considered throughout the disability determination process.</u>"(Emphasis added).

The Fourth Circuit held that the Commissioner must consider the combined effect of a claimant's multiple impairments and cannot fragmentize them. <u>Walker v. Bowen</u>, 889 F.2d 47, 49-50 (4th Cir. 1989) ("It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render a claimant unable to engage in substantial gainful activity."); <u>DeLoatche v. Heckler</u>, 715 F.2d 148 (4th Cir. 1983) (noting at page 150 that the most egregious error made by the ALJ was his "failure to analyze the cumulative or synergistic affect DeLoatche's various maladies have on her ability to work"). "As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." <u>Walker</u>, <u>supra</u>, at page 50.

The ALJ recognized his legal obligation: "At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe.' An impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect of an individual's ability to work." (Internal citations omitted) R. 22.

In the Decision, he determined Plaintiff "failed to establish any significant limitation during

the period since November 30, 2005, related to her complaint of **neck pain** or **carpel tunnel syndrome**" and that he considered Plaintiff's symptoms with respect to her carpal tunnel syndrome and cervical spine and upper extremities in assessing her residual functional capacity noting: 1) Dr. Mir's 2002 opinon that her carpal tunnel syndrome was "very mild" and she did not need any surgical decompression and her main problem was with her right shoulder Exhibit 19F; 2) a repeat electromyogram in 2003 did not show any electrophysiological evidence of carpal tunnel syndrome; 3) Dr. Mir's opinion in 2003 was that Plaintiff did not need carpal tunnel release and could continue with her regular work negating Dr. Russell's earlier opinion suggesting he might consider recommending a surgical remedy; 4) Dr. Mir's 2004 report reflecting that he prescribed physical therapy for treatment of epicondylitis and right scapular pain and with which Plaintiff failed to comply; 5) Dr. Jin's 2005 report of mild left carpal tunnel syndrome objectively supported by an electromyogram but as presented did not require surgical decompression and diffuse neck, shoulders and arm pain unrelated to the carpal tunnel; 6) negative 2004 MRI of the cervical spine (Exhibit 16F); 7) 2005 functional capacity evaluation showing Plaintiff "had average fine motor coordination and average gross motor coordination for all tests performed"; 8) no diagnostic studies supported Dr. Sherry's diagnosis of cervical degeneration and cervical radiculopathy; and 9) a "consultative examination on January 19, 2006, revealed full range of motion of the cervical spine and upper extremities and the claimant had no difficulty performing fine or gross manipulative activities with the upper extremities (Exhibit 4F)." R. 24-25.

With respect to the Plaintiff's claim of **lumbar spine** pain and limitation, the ALJ in reaching his conclusion that Plaintiff failed to establish that since November 30, 2005 clinical findings show her back condition satisfies a listing or could be expected to last for 12 consecutive months, considered: 1) a 2006 MRI showing bilateral foramina narrowing at L5-S1 worse on the

left; 2) Dr. Emory's earlier report of L5 radiculopathy on the right with some relief with selective nerve root injection at L5 and his opinion that her MRI scan did not correlate to those findings; that she had motor strength measured at 5/5 symmetrically bilaterally with intact sensation and equal and symmetric deep tendon reflexes, a negative straight leg raising test and the ability to walk heel and toe; 3) pre-op November 6, 2006 Plaintiff was 5/5 with intact sensation, 1+ and symmetric deep tendon reflexes, negative straight leg raising and a functional range of motion in spite of decreased lumbar spine range of motion and low back tenderness; 4) Plaintiff's post surgical November 21, 2006 report that the surgery relieved a lot of pain; 4) and examination reports of Dr. Sherry between November 21, 2006 and August 17, 2007 reflecting normal neurological findings in the lower extremities and a stable gait and station. R. 25-25.

With respect to Plaintiff's claim of **pulmonary impairment,** the ALJ in reaching the conclusion that it did not satisfy a listing considered: 1) her chronic obstructive pulmonary disease was secondary to her 39 pack-year history of smoking; and 2) that in spite of that history, her pulmonary function studies of October 12, 2006 were interpreted as normal (Exhibit 14 F). R. 26.

With respect to Plaintiff claim of mental impairments, in reaching his decisions that Plaintiff's mental impairments resulted in a moderate limitation, the ALJ considered: 1) July 18, 2006 assessment of the state agency psychological consultant (Exhibit 11F); 2) Plaintiff's history of being prescribed medication for depression related to her marital situation post husband's traumatic brain injury and the medications' reported partial control of her symptoms; 3) Plaintiff's failure to attend counseling sessions even during periods of difficulty as a result of domestic violence incidents; 4) Plaintiff's report of reuniting with her spouse and her medications controlling her depression in March 30, 2005 and April 5, 2006; 6) Dr. Goldizen's report of major severe depressive disorder dated October 4, 2005 , Plaintiff's inconsistent Global Assessment of Functioning rating of

55 (moderate impairment), and Dr. Goldizen's report of August 23, 2006 that Plaintiff was doing well mood wise;  7)Psychologist Stein's consultative psychological evaluation of February 2, 2006 of moderate depression associated with her general medical condition and psychological factors, major depression, recurrent type, non-psychotic and personality disorder NOS in spite of Plaintiff's claims of crying when describing her pain and feelings of worthlessness; 8) Plaintiff's failure to document any mental health treatment after that of Dr. Goldizen on August 23, 2006; 9) the failure of Dr. Sherry to note any mental impairment between August 23, 2006 and August 17, 2007; 10) Plaintiff's failure of drug screens ffor controlled substance compliance and substance misuse of August 17, 2007; 11) Plaintiff's claim she was diagnosed with ADHD in the face of no medical records to establish such a  diagnosis; 12) Plaintiff's failure to meet the level of severity of the  B and C criteria of Secition 12.04 and the B criteria for of Section 12.07 and 12.08 of Appendix 1; 13) the function report of July 6, 2006; and 14) Plaintiff's hearing testimony which the ALJ determined to not be entirely credible.  R. 26-29.

The ALJ then found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except she can perform all postural movements on an occasional basis, except she cannot climb ladders, ropes or scaffolds; she is unable to work in atmospheres involving high concentration of smoke, dust, fumes, or odors; she is unable to perform jobs requiring hih production rates, such as assembly line work, or high sales quotas, such as telemarketing; and she is limited to jobs requiring only occasional contact with supervisors, coworkers, or the general public.  R. 29.

In reaching the above finding the ALJ reported that he had " considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p.

Based on the foregoing, the undersigned concludes substantial evidence supports a conclusion that the ALJ did consider the combined effects of Plaintiff's severe and non-severe impairments that were supported by and consistent with the objective medical evidence and other evidence in the record.

B.     ALJ's failure to consider the effects of Plaintiffs medications.

C.     ALJ's failure to consider the combined effect of Plaintiff's impairments and the effect of her medications.

D.     ALJ's failure to explain his evaluation of the combined effects of Plaintiff's impairments and medications.

Plaintiff argues that the side effects of the medications she was taking would be enough to to cause her to be off task two hours a day thus making her unemployable. Plaintiff supports her contention by providing a listing of her medications and their side effects as reported by www.medicinenet.com. [2] Plaintiff's Motion For Summary Judgment, DE 13, p. 7,8 and 9.

While Plaintiff was provided with a myriad of prescription drugs, the evidence of record relative to her use of those medications and their effectiveness and effect on her can be generally described three ways: 1) in 2007 there is some evidence that Plaintiff was not taking her prescribed drugs and instead was self medicating with amphetamines, R. 27, 33; 2) when she took the medications, they had the desired effect in relieving her pain and attendant difficulties in walking and engaging in other activities, R. 28, 30, 32; and 3) she seldom reported or complained to her doctors about side effects of her medications and when she did, she either exaggerated them or they were not supported by the evidence or were considered and taken into account by the ALJ if reaching

_____

[2] www.medicinenet.com is not evidence in the record before the ALJ and therefore is not considered.

the RFC limiting Plaintiff to light work with certain postural limitations. R. 29, 30.

In the record before the ALJ, side effects of Plaintiff's medications were reported as follows:

1.  Disability Report, no side effects, R. 241;

2.  Disability Report - Appeal, no side effects, R. - 255;

3.  Personal pain questionnaire dated July 6-7, 2006 and prepared by Plaintiff reported: Methadone, Ultram, Tizanidine, and Trileptal caused side effects of: sleepiness, no energy, constipation, and bad mood," R. 263;

4.  Disability Report prepared by Plaintiff's counsel citing no side effects or limited side effects, R. 277:

    a.   Advair - none;

    b.   Albuterol - increaded heart rate;

    c.   Alderol xr - none;

    d.   Ativan - drowsiness;

    e.   Ibuprofen - gastrointestinal problems;

    f.   Methodone - none;

    g.   Tizaridine - drowsiness;

    h.   Trileptal - drowsiness;

    i.   Ultram - sweating; and

    j.   Wellbutrin - none.

5.  An August 30, 2004 notation that Plaintiff has lost some of her medication yet reporting she was continuing to work at the chicken plant with some discomfort in her wrists and neck but was not in acute distress, R. 575-576;

6.  Plaintiff ceased taking the Prozac prescribed for her depression and instead took her

husband's Wellbutrin, R. 456;

7. August 19, 2007 Dr. Sherry noted Plaintiff failed random drug screen for her controlled substance prescriptions and tested positive for amphetamines instead, R. 609;

8. Only once during the period between November 1, 2005 and November 20, 2007 did Christina Goldizen, MD note any adverse effects of the medications plaintiff was taking, R.375-381;

9. March 15, 2006 Plaintiff complained that she did not want to be on medications anymore because: she believed the medications were masking her symptoms instead of dealing with the problems creating the symptoms and she had constipation from the medications. R. 417.

In his decision the ALJ noted with respect to shoulder pain Dr. Mir "reported that the claimant's shoulder strain had improved with prescribed medication" R. 24 and 589, and "on May 25, 2004 claimant's therapist reported that the claimant was discharged from treatment as she was not compliant with treatment," R. 24 and 606; with respect to her back condition the ALJ noted Dr. Emery reported on September 6, 2006 "that the claimant had L5 radiculopathy on the right and that she had had some relief with selective nerve root injections at L5" R. 25, and that her back surgery had "relieved a lot of back pain" and examinations between November 21, 2006 and August 17, 2007 "revealed normal neurological findings in the lower extremities and the claimant's gait and station were stable," R. 26 and 481-561; with respect to her psychological or mental impairments the ALJ noted "[r]eports from claimant's treating clinic establish that the claimant has a history of being prescribed medication for complaints of depression related to her 'social situation' with her husband after he suffered a 'pretty serious' all-terrain vehicle accident" and that her falling down in

the dumps, frequent crying spells, feelings of worthlessness and feeling as if she wanted to run away were "somewhat controlled with prescribed medication" through March 30, 2005, R. 26; with respect to Plaintiff's self medication with amphetamines, the ALJ noted Dr. Sherry's report of August 17, 2007 report that Plaintiff had "failed a random drug screening for controlled substance medication compliance and substance misuse" reflecting that Plaintiff did not have the prescribed medications in her system but had amphetamines instead, R. 27; the ALJ considered and noted that Plaintiff claimed she was prescribed amphetamines for ADHD but provided Dr. Sherry with no evidence to support her claim that she had ADHD or had been prescribed amphetamines for ADHD, R. 27and 33; the ALJ considered and noted Plaintiff's testimony that when she got up at 7:00 a.m. she had "difficulty walking when she first gets up until she feels the effect of prescribed medication, R. 28; the ALJ in arriving at his conclusion that the overall record supports a conclusion that Plaintiff's mental impairments resulted in a moderate limitation noted and considered Plaintiff's testimony that her prescribed medication affects her ability to concentrate against the conflicting evidence that on February 2, 2006 her recent and remote memory function was moderately deficient and her immediate memory was mildly deficient whereas evaluations by treating physician Goldizen between December 2005 and August 2006 reflected Plaintiff's orientation, memory, attention and concentration were appropriate, R. 29; with respect to her back pain and shoulder pain, the ALJ noted and considered her testimony that lying down somewhat relieved the pain, that epidural injections for her back had provided temporary relief, that she self treated with a borrowed TENS unit with helped somewhat, R. 30; and the ALJ also considered and noted Dr. Sherry's report that Plaintiff's "current medications continued to be beneficial for chronic pain symptoms" and "that the claimant reported no side effects from medications. R. 30 and 32.

Accordingly, there is substantial evidence in the record that the ALJ appropriately considered

and explained the effects of Plaintiff's medications individually and in combination with her impairments in reaching his ultimate conclusion of non-disability.

E.    <u>Appeals Council's failure to consider additional new and material evidence</u>.

F.    <u>Appeal Council's failure to explain what, if any weight and consideration it gave to the allegedly new and material evidence</u>.

In <u>Wilkins v. Secretary</u>, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council will consider evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.    <u>Wilkins</u> further defined the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . .
> Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome.

<u>Id.</u> at 96.

Plaintiff argues the Commissioner failed to properly consider new and material evidence presented to the Appeals Council. Pursuant to 20 CFR § 404.970(b), the Appeals Council shall consider evidence submitted with a request for review if the evidence is new, material, and relates to the period on or before the dates of the ALJ's decision. As a threshold matter, Plaintiff suggests the claim should be remanded because the Appeals Council considered the new, interim evidence, but did not provide its reasoning in finding the evidence did not justify further administrative action, citing <u>Spruell v. Barnhard</u>, Civil Action No. BPG-05-2447 (Dist. Md). The undersigned recognizes this issue has generated conflicting opinions in the District Courts of the Fourth Circuit as well as the appearance of conflicting opinions (unpublished) within the Fourth Circuit Court of Appeals itself.

First, the regulations do not require the Appeals Council to state its rationale for denying

review.  See 20 C.F.R. § 404.970(b).

Second, Spruell is of no precedential value, as it is a decision from a magistrate judge of another district, the District of Maryland.

Third, in an unpublished opinion the Fourth Circuit specifically rejected the contention that the Appeals Council must articulate its own assessment of the additional information because the regulation addressing additional evidence does not direct it to do so.  See Hollar v. Commissioner of Social Security, 194 F.3d 1304 (4th Cir. 1999)(unpublished), cert. denied, 120 S. Ct. 2228 (2000) (citing Browning v. Sullivan, 958 F. 2d 817 (8th Cir. 1992), 20 C.F.R. § 404.970(b)).  cf., Harmon v. Apfel, 103 F. Supp. 2d 869 (D.S.C. 2000) (court declined to follow Hollar and instead required the Appeals Council to articulate its reasoning in declining review where new evidence was submitted.). [3]

The decision of the district judge in the Western District of Virginia concluded the exact opposite of the magistrate judge in Alexander.  In Ridings v. Apfel, 76 F. Supp. 2d 707 (W.D. Va. 1999), which was decided after Alexander, District Judge Jones held that the Appeals Council was not required to state its reasons for finding that the new evidence did not justify review of the ALJ's decision. Judge Jones expressly disagreed with the magistrate judge's reasoning that the Appeals Council must give a detailed assessment of its failure to grant review in the face of new evidence,

_____

[3] There are two conflicting unpublished Fourth Circuit opinions on this issue. In *Hollar v. Commissioner of Soc. Sec., 1999 WL 753999 (4th Cir.1999)*, the court rejected a claim that the appeals council must explain its treatment of additional evidence, because the regulation addressing additional evidence does not direct the Appeals Council to do so. See 20 C.F.R. § 404.970(b). However, in *Thomas v. Commissioner of Soc. Sec., 24 Fed.Appx. 158, 2001 WL 1602103 (4th Cir.2001)*, the Fourth Circuit found that the Appeals Council must indicate the reasons for discounting additional evidence." Scott ex rel. Scott v. Barnhard, 332 F.Supp.2d 869 (D.Md., 2004).

citing <u>Hollar</u>.[4]

Despite holding that the Appeals Council was not required to articulate its reasoning for denied review, Judge Jones affirmed the magistrate judge's recommendation that Ridings' claim be remanded to the Commissioner, because "substantial evidence [did] not support the ALJ's decision, <u>when reviewed along with [the new evidence]</u>." <u>Id.</u> at 709.

Other Courts have found that the Appeals Council is not obligated to discuss its treatment of additional evidence submitted after the ALJ issues its decision. <u>Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir.1992)</u>; <u>Damato v. Sullivan, 945 F.2d 982, 988 (7th Cir.1991)</u>. These courts assert that the language of the regulations does not require the Appeals Council to articulate its consideration of new evidence. <u>Browning, 958 F.2d at 822</u>. Moreover, these courts emphasize that when the Appeals Council denies review, the regulations allow the reviewing to court review only the actions of the ALJ. *878 <u>Id. at 822-23</u> (finding that "[j]urisdiction to review whether the Appeals Council has complied with the procedural requirements of the regulations does not imply jurisdiction to review the Appeals Council's non-final, substantive decision to deny review"). A number of other courts have found that an explanation from the Appeals Council is necessary for a reviewing court to properly perform its statutory function. <u>Hawker v. Barnhart, 235 F.Supp.2d 445, 452 (D.Md.2002)</u>; <u>Harmon v. Apfel, 103 F.Supp.2d 869, 873 (D.S.C.2000)</u>; <u>Riley v. Apfel, 88 F.Supp.2d 572, 579 (W.D.Va.2000)</u>. These courts assert that a reviewing court cannot properly review an administrative record without an understanding of the weight assigned to all evidence. <u>Hawker, 235 F.Supp.2d at 449</u>.

---

[4]Judge Jones did cite <u>Alexander</u> in a footnote, stating: "At least one other magistrate judge of this district has held that the Appeals Council must articulate some reason for finding that the new evidence does not justify review." <u>Id.</u> at n.6.

In prior decisions, for the reasons stated therein, the undersigned has consistently held that the Appeals Council is not required by regulation to explain what, if any weight and consideration it gave to allegedly new and material evidence. The undersigned once again concludes that the regulations do not require the Appeals Council to explain what, if any weight and consideration it gave to the allegedly new and material evidence submitted by Plaintiff Delawder post ALJ decision.

The ALJ's decision was rendered October 9, 2007. R. 21-36. On January 3, 2008 Counsel for Plaintiff submitted a letter of protest to the Appeals Council and attached for filing 34 pages of what he characterized as "new and material evidence completed by the claimant's treating physician, Dr. Goldizen." R. 610-644. A review of that "new and material evidence reveals that the documents submitted and made a part of the record as the Outpatient Counseling Evaluation/Assessment dated 10/4/05 at pages 611-613 is precisely the same Outpatient Counseling Evaluation/Assessment previously submitted and reviewed by the ALJ as R. 382, 383 and 384 and therefore is not new and material evidence. In addition, the review further reflects that the documents submitted as R. 617, 618, 619, 620, 621, 622, and 623 are precisely the same documents previously submitted and reviewed by the ALJ as R. 375, 376, 3777, 378, 379, 380 and 381 and are not new and material at all. Of the remaining documents submitted post ALJ decision, the Mental Residual Functional Capacity Assessment, R. 627-644, and the three pages of Medication Management Notes for October 30, 2007, February 6, 2007 and October 24, 2006, 614, 615, and 616, do not previously appear in the record before the ALJ.

The three pages of Medication Management Notes, 614, 615, and 616, are cumulative and reasonably would not have changed the outcome before the ALJ and therefore need not be considered by the Appeals Council. Wilkins v. Secretary, 953 F.2d 93 (4th Cir. 1991). Medication Management Notes dated October 24, 2006 and February 7, 2007 are identical to each other with

respect to mental status and medication review. The only differences in the two reports is that the October 24 report is prior to back surgery and the February 7, 2007 report is post back surgery and notes "doing well ... has gotten some relief." R. 615 and 616. The Medication Management Note dated October 30, 2007 reflects a change in the Plaintiff's mental status in the areas of mood = "down", affect= "constricted", sleep marked "same" and energy marked "down". In the section of the note for Medication Review it was noted that the medications' efficacy were marked "no" and change in medication was marked "yes". The summary noted that Plaintiff was "very depressed", had increased pain, and was "off methadone." R. 614. These notations are not substantially different from that which was before the ALJ in Medication Management Note dated February 7, 2006 wherein it was noted that Plaintiffs sleep and energy were "down" and her affect was noted as "restricted." R. 620/378. Throughout Dr. Goldizen's treatment of Plaintiff, she or her staff noted that Plaintiff was depressed from pain and marital problems. Dr. Goldizen concluded Plaintiff suffered with major depression, severe and back pain and marital problems and loss of job in her Assessment which was before the ALJ dated October 4, 2005. R. 613/384.

Finally, the Mental Residual Functional Capacity Assessment (MRFCA) performed by Dr. Goldizen on November 20, 2007, approximately five weeks after the ALJ rendered his adverse decision, is inconsistent in with other such assessments and, in some respects inconsistent and in some respects consistent with the longitudinal record created by Dr. Goldizen's own office, all of which was before and considered by the ALJ. Accordingly, although the November 20, 2007 assessment is new and was not before the ALJ, it would not have reasonably changed the outcome and it need not be considered by the Appeals Council. *Id.* To the extent that Dr. Goldizen's MRFCA found severe depression, markedly limited ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended

periods, to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to travel in unfamiliar places or use public transportation, to set realistic goas or make plans independently of others which was equal to listing 12.04, R. 627-644, it is inconsistent with and contrary to the MRFCA and Psychiatric Review Technique preformed by Joseph Kuzniar, Ed.D. on July 18, 2006, R.357-374; the MRFCA and Psychiatric Review Technique performed by Joseph A. Shaver, Ph.D. on April 13 2006, R. 339-356; and the moderately deficient concentration, mildly deficient persistence and moderately slow pace found by Thomas C. Stein, ED.D. in his February 2, 2006 Mental Status Examination, R. 324-327. With respect to Dr. Goldizen's finding Plaintiff had "impaired memory, concentration and judgment- ... mood swings", these were noted in the Outpatient Counseling Evaluation/Assessment Dr. Goldizen did on October 4, 2005, R. 611-613, and were therefore before the ALJ at the time of his decision. Accordingly, the Appeals Council was not required to consider the the MRFCA and Psychiatric Review Technique of Dr. Goldizen.

G.    <u>ALJ's averred error in finding the Plaintiff was capable of performing light work with limitations without explaining for each function of such light work as required under Social Security Ruling.</u>

The RFC assessment must first identify the individual's functional limitations or restrictions and assess her work-related abilities on a function-by-function basis. Then, after this assessment, the ALJ may determine the individuals RFC in terms of exertional levels of work. *See* SSR 96-8p.

Plaintiff relies on the following: "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record..." 61 Fed.Reg. 34474, 34478, Converse v. Apfel, 144 F.Supp.2d 1045. In this N.D. Indiana case, the ALJ's "failure to fully discuss and reconcile treating psychiatrist's seemingly inconsistent findings, in concluding that Social Security claimant who alleged disability from bipolar disorder possessed residual functional capacity (RFC) to perform past work as assembler and laborer and thus was not disabled, required remand for more fully developed explanation; ...."

The facts of the instant case are substantially different than the facts of the cited Indiana case. After meticulously detailing Plaintiff's back and lower extremity complaints from the medical records, R. 30-32, the ALJ in the instant case found "that the claimant has had some reduced range of motion of the back during the period on question but that she has had on ongoing neurological deficit in the upper or lower extremities even prior to her back surgery." He went on to conclude: "the claimant's back condition and any residuals from her surgery have been adequately accommodated by limiting the claimant to the range of light work detailed above. She has failed to establish any period that has lasted or could be expected to last for a continuous period of 12

consecutive months during which her back condition would preclude her performance of the demands of this range of light work. Further, she has failed to establish that she has any upper extremity impairment that would preclude her performance of this range of light work." R. 32, 25. In addition, the ALJ discussed Plaintiff's complaints and medical record concerning carpal tunnel syndrome and concluded "that any carpal tunnel syndrome or impairment involving the cervical spine or upper extremities is not severe, the claimant's symptoms in this regard have been considered in assessing her residual functional capacity detailed below." R. 25.

With respect to Plaintiff's pulmonary complaints, the ALJ again meticulously discussed the diagnosis of COPD, a life history of smoking aggravating her condition, un unremarkable chest x-ray on October 12, 2006, remarkably normal pulmonary function studies and concluded from the record that "the claimant's pulmonary impairment and any impact on this condition associated with her smoking has been adequately accommodated by limiting her to the range of light work detailed above that includes appropriate environmental limitations." R. 32-33, 26.

With respect to her mental health treatment record, the ALJ found "that the longitudinal record supports a finding that the claimant's mental impairments result in moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace. These difficulties have been adequately accommodated by limiting the claimant to the mental demands of the range of light work detailed above. The claimant has been limited to a range of low stress work that requires limited contact with others." R. 33-34. The ALJ evaluated Plaintiff's activities of daily living with respect to both her claimed mental and physical impairments. R. 26, 27, 28 and 29.

Based on the analysis of record, R. 23-34, the ALJ found: "that the claimant has the residual functional capacity to perform light work except she can perform all postural movements on an occasional basis, except she cannot climb ladders, ropes, or scaffolds; she is unable to work in

atmospheres involving high concentration of smoke, dust, fumes, or odors; she is unable to perform jobs requiring high production rates, such as assembly line work, or high sales quotas, such as telemarketing; and she is limited to jobs requiring only occasional contact with supervisors, coworkers, or the general public." R. 29.

In summary, the ALJ in the instant case reviewed the entire medical record of multiple health care providers in reaching his conclusions and RFC and was not simply dealing with the inconsistencies of one treating physicians records.

The undersigned concludes substantial evidence in the record supports the ALJ's RFC and further concludes that the ALJ used the appropriate procedure as required under SSR 96-8p to reach the RFC.

H.      ALJ's averred error in failing to consider or explain why he did not consider the RFC of Dr. Sherry

The ALJ did not refer to the RFC of Dr. Sherry in his unfavorable decision. Plaintiff concedes the ALJ considered Dr. Sherry's medical records in his decision, just not the RFC. The RFC was performed by Dr. Sherry on July 14, 2005 prior to her back surgery and outside of the period under consideration. R. 520. Dr. Sherry notes that he did not have reports from various tests including MRI's at the time of his evaluation. R. 520. Dr. Sherry noted that "[this is further indicative of symptom magnification as all numbers are excessively high." R. 521. He found that Plaintiff "scored a 42 on the McGill pain Questionnaire, indicating symptom magnification syndrome on her behalf." R. 521. He also found that in another questionnaire focusing on cervical spine pain, Plaintiff scored herself as "68% disabled which would place her in the crippled category." He found this as additional evidence of symptom magnification "as she is clearly not crippled." R. 521. On the disabilities of the arm, shoulder and had questionnaire, Plaintiff saw herself "as 79%

disabled which would place her in the crippled category and only 1% from bed bound." He found

this as additional evidence of " symptom magnification as she is clearly not crippled or bed bound."

R. 521. Review of the musculoskeletal-evaluation, lift testing, manual dexterity testing, MET testing

and mobility testing /functional testing/functional tolerances results, R. 521-523, shows that, even

at this early date and prior to any surgical relief, Dr. Sherry believed: "[b]ased on the cardiovascular

endurance, the client would fint into the medium classification for work, however, due to other

restrictions such as lifting, she does not meed (sp) medium level capabilities for work."  R. 523.

"Because the ALJ conducted the proper analysis in a comprehensive fashion and cited

substantial evidence to support his finding, and because there is no question but that he would have

reached the same result notwithstanding his initial error, I would affirm.  I therefore concur in the

judgment."  Mickles v. Shalala, 29 F.3d 918, 921 (Judge K.K.Hall's concurring opinion) (4th Cir.

1994).

The ALJ's failure to consider the dated RFC, while erroneous, would not have changed the

outcome inasmuch as: 1) the RFC supports the ALJ's conclusions; 2) the RFC is prior to the period

under consideration and therefore does not take into account Plaintiff's substantial medical record,

including surgery, testing, evaluation and treatment, during the relevant time period; 3) the ALJ, in

his RFC limited Plaintiff to light with additional restrictions and limitations which were substantially

supported by other later RFC's of record; and 4) the ALJ would have reached the same result had

he considered the RFC.

## RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's

decision denying Plaintiff's applications for SSI and DIB, and I accordingly recommend that

Defendant's Motion for Summary Judgment be **GRANTED**, Plaintiff's Motion for Summary

Judgment be **DENIED**, and that this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 16TH day of July, 2009.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE